**RECEIVED**
IN LAKE CHARLES, LA.

**MAY 12 2011**

TONY R. MOORE, CLERK
BY_____
                    DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **MICHAEL R. BOURGEOIS, et al.** | : | **DOCKET NO. 2:09 CV1043 (Lead)** |
| | | **2:09 CV1044 (Member)** |
| **VS.** | : | **JUDGE MINALDI** |
| **LOCAL 112 INSULATORS &** | : | **MAGISTRATE JUDGE KAY** |
| **ASBESTOS WORKERS, LOCAL 112** | | |
| **INSULATORS & ASBESTOS** | | |
| **WORKERS HEALTH & WELFARE** | | |
| **FUND, and LOCAL 112 INSULATORS** | | |
| **& ASBESTOS WORKERS PENSION** | | |
| **TRUST FUND** | | |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment, filed by Local 112 Insulators & Asbestos Workers ("the Union"), Local 112 Insulators & Asbestos Workers Health & Welfare Fund ("the Health and Welfare Fund"), and Local 112 Insulators & Asbestos Workers Pension Trust Fund ("the Pension Fund") (collectively, "Insulators") [Doc. 32]. The plaintiffs, Michael R. Bourgeois, et al., filed an Opposition as well as a Cross-Motion for Summary Judgment [Doc. 41]. The Cross-Motion for Summary Judgment was filed on November 23, over a month past the October 20 dispositive motions deadline. Insulators filed a Reply to the plaintiffs' Opposition [Doc. 45].

With respect to the Cross-Motion for Summary Judgment, Insulators filed a Response and, with Court approval, supplemented its earlier Reply brief [Doc. 55]. The plaintiffs filed a Reply to Insulator's Response in Opposition to the plaintiffs' Cross-Motion for Summary Judgment [Doc. 57].

1

When it filed its initial Motion for Summary Judgment, Insulators also submitted two additional Motions for Summary Judgment: the first against Mechanical Systems Insulation, Inc. ("MSI") [Doc. 33], and the second against Administrative Benefits Management, Inc., the Succession Representative of Loice Firmature, and Cynthia R. Amato (collectively, "ABM") [Doc. 34]. Both MSI and ABM filed Responses in Opposition [Docs. 40 & 41]. And Insulators filed its respective Reply briefs based on those Responses [Doc. 55].

## BACKGROUND

In the plaintiffs' lawsuit, brought exclusively under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001 *et seq.*, they dispute the Union's decision to eliminate all pension and health credits derived from contributions by the plaintiffs' now defunct employer, MSI.[1] Insulators, through its Trustees, eliminated all employee fringe benefit credits (i.e., both pension and health & welfare credits) based on contributions from MSI because MSI was not and never had been a signatory to the collective bargaining agreement.[2] The plaintiffs, however, argue that MSI was not required to sign the collective bargaining agreement because neither the controlling statute nor the collective bargaining agreement requires a signature. Instead, MSI's course of conduct was sufficient to manifest consent to the collective bargaining agreement.[3] Before filing this lawsuit, the plaintiffs exhausted their administrative remedies.

---

[1] *See* Compl. [Doc. 1, 2:09 CV1043]; Compl. [Doc. 1, 2:09 CV1044]. The lawsuit consists of two consolidated actions: Michael R. Bourgeouis, et al. v. Insulators, Civil Action Number 2:09 CV1043 and Richard Farris v. Insulators, Civil Action Number 2:09 CV1044.

[2] *See* Defs.' Mem. in Supp't. of Summ. J. [Doc. 32].

[3] *See* Pls.' Opp'n [Doc. 41]. For purposes of this memorandum ruling, any reference to collective bargaining agreement also includes the pension trust agreement and health and welfare trust agreement. For sake of simplicity, this Court refers to those agreements collectively as the "collective bargaining agreement" or the "agreement."

The plaintiffs seek judicial review of the Trustees decision to eliminate their fringe benefit credits, and they request that those benefits be reinstated. The plaintiffs assert that they are entitled to recover the benefits that have been withheld, 29 U.S.C. 1132 (a)(1)(B). They also request judicial enforcement of the plan's rights, *see id.*, and apparently allege that Insulators breached ERISA by not informing the plaintiffs of the adverse consequences of MSI not being a signatory to the collective bargaining agreement, *see* 29 U.S.C. §§ 1132(a)(3) & 1104. They seek damages, penalties, and attorneys' fees as well as all general and equitable relief allowed under the law.[4]

In the event that the Court finds in favor of the plaintiffs, Insulators filed a third-party complaint against MSI for delinquent contributions and to conduct a payroll audit.[5] It also filed a third-party complaint against ABM, seeking recovery for breach of contract under Louisiana Civil Code article 1994. In the event the plaintiffs prevail, Insulators requests: (1) reimbursement for benefits paid to the plaintiffs; (2) a refund of fees paid to the Administrator; and (3) damages for other benefits wrongly provided.[6] This Court has jurisdiction over this lawsuit pursuant to 29 U.S.C. 1132(e), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

This is a denial of benefits case under ERISA, in which the plaintiffs seek judicial review of the Trustees' determination to deny fringe benefit credits. Accordingly, this Court must determine the standard of review.

Notably, neither party has briefed the issue, most likely because the ultimate determination of the case rests, in part, on an interpretation of law. Nevertheless, the Supreme

---

[4] *See* Compl. [Doc. 1].

[5] *See* Third-Party Comp. [Doc. 9].

[6] *See* Third-Party Compl. [Doc. 8].

Court directs district courts "to review a denial of plan benefits 'under a *de novo* standard' unless the plan provides to the contrary. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Since the plan does not provide to the contrary, this Court finds that the *de novo* standard applies. *Id.* Typically, the review is limited to the scope of the administrative record. However, the Fifth Circuit allows a reviewing court to look to all relevant evidence. *See, e.g., Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 639 (5th Cir. 1992) (applying the abuse of discretion standard).[7] Thus, the Trustees decision is given no deference, and this Court considers all relevant evidence to determine whether the plaintiffs are entitled to relief. *See id.*

## FACTS

Pursuant to a Collective Bargaining Agreement, the Union established the Pension Fund and the Health & Welfare Fund collectively with employers to provide retirement and health benefits to eligible employees and union members.[8] These funds are multiemployer plans established under the Labor Management Relations Act of 1947 ("LMRA"), also known as the

---

[7] Apparently, the circuits are split over whether a court may review evidence outside the administrative record. The Sixth Circuit has held that no evidence beyond the administrative record is permissible. *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966-67 (6th Cir.1990). However, the Eleventh Circuit allows the district court to consider all evidence outside of the administrative record, without restriction. *See Moon v. American Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir.1989). Other courts, including the Eighth Circuit, permit some additional evidence, but only when the administrative record is inadequate to conduct a proper review of the administrative decision. *See Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir.1993) (decision within discretion of trial court, which should not be exercised absent good cause); *Quesinberry v. Life Ins. Co. of N. Amer.*, 987 F.2d 1017, 1021-27 (4th Cir.1993) (en banc); cf. *Luby v. Teamsters Health, Welfare, and Pension Trust Funds*, 944 F.2d 1176, 1184-85 (3d Cir.1991) (where record is sufficiently developed below, court may limit review to that evidence even upon de novo review). The Second Circuit has held that additional evidence may be considered upon de novo review of an issue of plan interpretation. *See Locher v. Unum Life Ins. Co.*, 389 U.S. 288 (2d Cir. 2004).

[8] Defs.' Reply [Doc. 45-3].

Taft-Hartley Act. Although employer contributions to employee representatives and the receipt of those contributions by employee representatives are unlawful, 29 U.S.C. § 186(a) & (b) (2006), the LMRA established a narrow exception to this exclusionary rule in § 186(c).[9] One requirement of § 186(c) specifies that an employer may make contributions to an employee trust fund only when "the detailed basis on which such payments are to be made is specified in a written agreement with the employer." Absent a "written agreement," it is unlawful for the employer to pay benefits to an employee representative, including the trustees administering the trust fund. *Id.* § 186. The receipt of such payments by employee representatives is absolutely forbidden.

The plaintiffs here are all former employees of MSI and members or former members of the Union.[10] In 1993, Richard Farris formed MSI, a modest construction company with at least two and no more than twelve employees at any given time of operation. Not long after forming MSI, Mr. Farris contacted Charles Ray Dronet, the former business manager of the Union, and informed him of MSI's intent to join the multi-employer plan. In 1995, MSI allegedly joined the plan and began remitting contributions to the Funds. As MSI's operations grew, it contributed on behalf of additional employees.[11]

---

[9] To establish a multi-employer plan under the LMRA, labor and management negotiate an employer contribution plan and establish a trust fund. Labor organizations bargain with additional employers to add employees to the plan. Ultimately, employer contributions – determined through collective bargaining – fund the multiemployer plans. The funds are jointly administered by labor and management (the number of trustees representing labor and management must be equal). Each group appoints trustees, who adopt a trust agreement and administer a trust fund. In contrast with traditional, single-employer plans, multiemployer plans allow employees to move from job-to-job while still earning credits toward future benefits, as long as each employer is subject to a collective bargaining agreement requiring plan contributions. *See generally* 29 U.S.C. § 186.

[10] Compl. ¶ 5.

[11] Defs.' Mot. for Summ. J. Ex. 1, Deposition of Richard Farris, 45, 54-55 [Doc. 32-3].

In 1998, James Edgar Mims replaced Mr. Dronet as the business manager of the Union. Shortly after taking office, Mr. Mims discovered that MSI was not a signatory to the collective bargaining agreement. He allegedly contacted Mr. Farris and explained to him that a contract needed to be signed, and Mr. Farris allegedly reassured him that they would "work something out." However, no contract was signed that year.[12]

At the Pensions Fund's regular meeting in June of 1999, the Funds' attorney, Maria Cangemi, expressed concern over unsigned participation agreements. Specifically, she noted that if no agreement was signed, the Funds cannot accept contributions from those non-signatory employers because it would violate Department of Labor requirements. MSI was listed as one of the employers that had not signed the agreement. To ensure compliance, the Trustees requested that the Pension Funds' third-party administrator, Administrative Services, obtain signed agreements from contributing employers who had not signed the participation agreement.[13] Louis Firmature, the Administrative Services employee charged with the responsibility to administer the Funds, represented Administrative Services at this meeting. Ms. Firmature allegedly assured the Trustees that the participation agreements had been drafted and mailed to the non-signatory contractors. It is further alleged that she explained the consequences of failing to respond in those letters; specifically, that "she would return [the non-signatory employer's] contributions."[14]

---

[12] Defs.' Mot. for Summ. J. , Ex. 3, Deposition of James Edgar Mims, 31, Ex. 1, Deposition of Richard Farris, 72-75 [Docs. 32-5 & 32-3].

[13] Defs.' Mot. for Summ. J. 6 [Doc. 32-1]; *Id.*, Ex. 4, Board of Trustees June 6, 1999 minutes, 3 [Doc. 32-6]. At this time, the third-party defendant, ABM, was not yet in existence.

[14] Defs.' Mot. for Summ. J. Ex. 5, Deposition of Michael Bourgeois, 6 [Doc. 32-7].

Shortly after this meeting, Ms. Firmature informed the Trustees that she was leaving Administrative Services to start her own administration company, ABM, where she would act as President. In February 2000, the Trustees hired ABM as the third-party administrator of the Pension Fund and Health & Welfare Fund, and allegedly granted it non-discretionary authority and control of the funds. ABM's administrative responsibilities purportedly included maintaining "a current master listing of all contributing employers, together with their written collective bargaining agreements, participation agreements or other evidence of contribution obligations [and] verify[ing] that such a written obligation [was] in effect prior to accepting employee contributions."[15]

In addition, the administrative services contract required ABM to procure and maintain Errors and Omissions insurance coverage. In the event ABM failed to obtain and maintain insurance coverage, the contract required ABM "to provide the Trustees with a personal guarantee signed by the Company's owner." Initially, ABM did not procure the required insurance, opting instead to sign a written guarantee. ABM, however, later obtained the necessary insurance coverage. Apparently, when ABM eventually obtained the required Errors and Omissions insurance coverage, the earlier personal guarantee was rendered invalid. In April 2006, ABM again allowed its insurance to lapse, and it also allegedly failed to verify that a signed obligation was in effect before accepting contributions from MSI.[16]

Meanwhile, from 1998 through 2006, Mr. Mims and Mr. Farris periodically discussed Mr. Farris signing the collective bargaining agreement on behalf of MSI, to no avail. In 2006,

---

[15] See Defs.' Mot. for Summ. J. 6 -7 [Doc. 34-1]; see Defs.' Motion for Summ. J., Ex. 7, Pension Fund/ABM Contract, Ex. 8, Welfare Fund/ABM Contract [Docs. 34-9 & 34-10].

[16] See Defs.' Motion for Summ. J., Ex. 7, Pension Fund/ABM Contract, Ex. 8, Welfare Fund/ABM Contract [Docs. 34-9 & 34-10]; see also Defs.' Mot. for Summ. J., Ex. 9, Board of Trustees December 4, 2007 minutes, 7-8 [Doc. 34-11].

after informing the Union that he would not seek re-election as business manager, Mr. Mims allegedly stepped-up his efforts to have Mr. Farris sign a copy of the collective bargaining agreement. Mr. Mims claims that he and Mr. Farris met a few times that year. On each occasion, Mr. Farris never signed the agreement. Although Mr. Farris did not explicitly refuse to sign the agreement during this time, he allegedly took issue with certain language in the contract, at some point, stating that he could not sign the contract with that language.[17]

Later that year, MSI was selected for an audit by the Funds. Ms. Cangemi called Mr. Farris to schedule a time for the audit and explained the audit process. Expressing reservation, confusion, or curiosity, Mr. Farris purportedly asked Ms. Cangemi what gave her the right to come to his house and look through his business records. She responded that the Union contract gave her the authority to conduct an audit. At this point, he informed her that he had never signed the collective bargaining agreement.[18]

Over the next few months, Ms. Cangemi and representatives from the Funds allegedly asked Mr. Farris to sign a contract, warning him that his failure to do so could result in his employees losing their fund credits. Again, Mr. Farris refused to sign the agreement. During that time, Mr. Farris learned that the pension and health and welfare funds were in "red zone status"; meaning, there was significant unfunded liability. Insulators asserts that Mr. Farris provided three reasons for not signing the agreement: "(1) he wanted to pay benefits only on Union members; (2) he did not want to sign a retroactive contract; and (3) he only wanted to sign a

---

[17] Defs.' Motion for Summ. J., Ex. 3, Deposition of James Edgar Mims, 43-44, 58-59 [Doc. 32-5].

[18] Defs.' Motion for Summ. J., Ex. 1, Deposition of Richard Farris, 96-98 [Docs. 32-3].

contract that would alleviate any responsibility [MSI might have] for the unfunded liability for the Fund."[19]

During this time, Insulators purportedly learned that MSI's pay practices did not comply with the collective bargaining agreement. For instance, Mr. Farris did not reduce MSI's wage rates by one dollar upon notice from the union that more wages needed to be contributed to the Funds. MSI, instead, contributed those funds directly. In addition, Mr. Farris apparently banked his employee's hours, rather than note the actual hours worked by each employee, so the employee could secure additional benefits when work hours were insufficient to meet credit requirements. Likewise, Mr. Farris did not contribute on behalf of the non-Union employees who were engaging in bargaining unit work.[20]

Meanwhile, by the end of 2006, ABM was no longer the third-party administrator of the funds, and Barbara Chapman was hired as an independent contractor to administer the funds in January 2007. Shorty after she began her tenure as third-party administrator, Ms. Chapman allegedly discovered many errors and compliance issues involving ABM's administration of the Funds. According to Ms. Chapman, ABM was incorrectly tracking eligibility for the Insulator Funds. As a result, a fund paid out a large claim on someone who was not eligible. She further claims to have discovered a number of additional defects, such as: (1) ABM was not properly insured, (2) ABM granted non-existing bank hours to employee, and (3) ABM failed to comply with its contractual obligations and properly administer the Funds' Plan documents.[21]

---

[19] See Defs.' Motion for Summ. J., 9 [Doc. 32-1]; see Ex. 1, Deposition of Richard Farris, 115-117, 127, 132, & 136 [Docs. 32-3].

[20] See Defs.' Motion for Summ. J., 8 [Doc. 32-1]; see Ex. 1, Deposition of Richard Farris, 74-80, 105-107 [Docs. 32-3].

[21] See Defs.' Mot. for Summ. J. [Doc. 34].

Around the same time the Funds hired Ms. Chapman, Kevin Smith replaced Mr. Mims as the Union's business manager. Mr. Smith was asked to meet with Mr. Farris with the hope that Mr. Farris would sign the collective bargaining agreement. No agreement was signed. The Board of Trustees met on April 17, 2007, and voted to eliminate all pension credits earned by employees of MSI because Mr. Farris had not signed the collective bargaining agreement on behalf of MSI, and, as Insulators asserts, that there was consequently "no contract authorizing the submission of such contributions." In other words, since the contributions were made illegally, the employees on whose behalf they were made cannot lawfully receive those benefits from the fund.[22]

The plaintiffs were notified of the decision and appealed. The Trustees denied the appeal. In the appeal letter, the Trustees cited two reasons for the denial. First, "[b]ecause no representative of MSI ever signed any collective bargaining agreement, the detailed basis on which distributions were to be made was not specified in a written agreement, as required by 29 U.S.C. § 186." Thus, the contributions were unlawful.

Second, the Trustees found that Mr. Farris's "conduct [did] not reflect an unambiguous intent to adopt the [collective bargaining agreement]." They noted that Mr. Farris initially refused to sign the collective bargaining agreement in 1995 or 1996, and Mr. Farris reiterated this refusal again in 2007. The Trustees further explained that MSI violated the terms of the collective bargaining agreement when it ceased "contributing on behalf of its employees at the point in each year that each employee secured sufficient hours for either a full year of pension credits, or for a full year of health insurance eligibility." At that point, MSI would then increase its employees' paychecks by the amount of the contribution. Finally, the Trustees cited Mr.

---

[22] *See* Defs.' Mot. for Summ. J., Ex. 7, Board of Trustee Minutes Feb. 28, 2007, Ex. 8, Board of Trustee Minutes April 17, 2007 [Docs. 32-9 & 32-10].

Farris refusal to submit to a payroll audit as evidence MSI refused to adopt the collective bargaining agreement through its conduct.

The Trustee decision then went on to describe the decision of certain cases, explaining that the Fifth Circuit has adopted a strict interpretation of § 186. Based on this purported conservative approach, the Trustees found that "because MSI's contributions were not pursuant to a signed written agreement, no agreement existed. Furthermore, there is an absence of sufficient evidence to show adoption by conduct." Thus, the Trustees denied the plaintiffs' appeal, affirming its earlier decision to eliminate the plaintiffs' employee-benefit credits.[23] After the appeal was denied, this lawsuit ensued.

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion by identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). If the dispositive issue is one that the nonmoving party bears the burden of proof at trial, the moving party may satisfy its burden by merely identifying evidence in the record that negates an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.*

---

[23] *See* Defs.' Mot. for Summ. J., Ex. 11, Appeal Decision [Doc. 32-11].

If the movant satisfies this burden, however, then the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Tubacex,* 45 F.3d at 954. In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, summary judgment is warranted when the record as a whole "could not lead a rational finder of fact to find for the non-moving party." *Id.*

## ANALYSIS

In its Motion for Summary Judgment, Insulators argues that without a participating employer's signature on the collective bargaining agreement, the "written agreement" exception of § 186(c)(5)(B) has not been satisfied. Failure to satisfy this requirement renders the employer's contribution to the trust fund unlawful. Consequently, the employees, on whose behalf those contributions were made, cannot legally receive benefits from the fund for those payments. At issue, therefore, is whether an employer must sign a written collective bargaining agreement to satisfy § 186(c)(5)(B)'s "written agreement" exception.[24] *See Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581, 591 (1993) (holding that the establishment of the pension plan must satisfy § 186, but the administration of such a plan falls under ERISA).

Alternatively, Insulators contends that even if a signature is not required to satisfy § 186(c)(5)(B), MSI's conduct does not rise to the level of "adoption by conduct."[25] Accordingly, at issue is also whether Farris's actions were insufficient, as a matter of law, to manifest assent to the collective bargaining agreement.

---

[24] Def.'s Mem. in Supp't. of Mot. for Summ. J. 11-17 [Doc. 32-1].

[25] *Id.*

In their cross-motion for summary judgment, the plaintiffs assert that no signature is required under 28 U.S.C. § 186. They further assert that MSI is a party to the collective bargaining agreement because it engaged in a course of conduct establishing assent to the collective bargaining agreement.

For the reasons stated below, this Court holds that (1) a signature is not required to satisfy § 186(c)(5)(B)'s "written agreement" prerequisite, and (2) there is a genuine issue of material fact as to whether MSI's course of conduct manifested assent to the collective bargaining agreement.

In addition, Insulators requests this Court to enter summary judgment against the third-party defendants, MSI and ABM, in the event Insulators does not prevail in this litigation. Since there is an issue of material fact over whether MSI is a party to the collective bargaining agreement under § 186, this Court holds that a determination of liability against ABM and MSI is premature, as resolution turns on the issue of whether MSI is bound by the collective bargaining agreement and trust agreement.

## 1. THE SUMMARY JUDGMENT MOTIONS

### a. *"Written Agreement" Requirement*

Insulators relies on two cases for the proposition that an employer signature is required to satisfy the "written agreement" requirement of § 186(c)(5)(B): *Bricklayers Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975) and *Moglia v. Geoghegan*, 403 F.2d 110 (2d Cir. 1968). Though relevant, neither case imposes a statutory signature requirement under § 186(c)(5)(B).

In *Bricklayers*, the Fifth Circuit affirmed the district court's order granting the defendant-employer's motion for summary judgment and held that it was not bound to make pension and

health and welfare payments on behalf of its employees because the "writing" failed to comply

with § 186(c). 512 F.2d at 1019-20. In that case, a collective bargaining agreement between the

defendant-employer and the plaintiffs, which included a local labor union, established a schedule

of payments that required participating employers to contribute to a designated health and

welfare fund and pension fund. *Id.* at 1020. However, the trust agreements governing those

funds were not yet in existence. *Id.* In addition, the collective bargaining agreement, by its terms,

required both types of payments to be made to a single "health and welfare fund." *Id.* at 1020,

1027. Months later, the plaintiffs set out, in writing, the health and welfare trust agreement, but

they did not create a pension trust agreement. *Id.* at 1020. As such, the collective bargaining

agreement failed to comply with the requirements of § 186(c)(5).

  Almost two years after executing the collective bargaining agreement, and apparently

upon realizing that the commingling of pension funds and health and welfare funds into a single

fund violated the plain language of § 186(c)(5)(C), the plaintiffs' business manager drafted a

pension trust agreement. *Id.* at 1021. He also instructed employers to continue making payments

to the health and welfare funds, but later "cryptically" requested that employers withhold

payments to both funds or make payments to their employees directly. *Id.* During this period of

confusion, the defendant did not contribute to the funds. *Id.* The plaintiffs filed a lawsuit,

requesting the court to compel payments from the defendants. The defendants argued that the

instruments relied on by the plaintiffs did not meet the necessary prerequisites of § 186(c)(5);

thus, any payments would be unlawful under § 186(a). *Id.*

  The Fifth Circuit dismissed the plaintiffs' assertion that the collective bargaining

agreement was sufficient to satisfy § 186(c)'s "written agreement" requirement. *Id.* at 1029-30.

In doing so, the court rejected the plaintiffs' argument that the collective bargaining agreement

incorporated by reference the trust agreements. *Id.* at 1028-29. Since "[a]n instrument may

incorporate by reference only the terms of an instrument already in existence," the court

reasoned that the chronology of the instruments rendered incorporation by reference impossible.

*Id.* at 1029. The trust agreements did not exist until after the collective bargaining agreement was

executed; thus, the collective bargaining agreement could not incorporate by reference either

trust agreement. *Id.*

Moreover, the Fifth Circuit explained that the language of the collective bargaining

agreement rendered the writing deficient, noting that "it [did] not even 'anticipate' the creation

of a pension trust fund that would conform to the requirements of Section 186(c)(5)(C)." *Id.*

Instead, the collective bargaining agreement anticipated the creation of only a health and welfare

fund. *Id.*

More importantly, the health and welfare trust agreement, by its terms, required a

signature to bind employers. *Id.* The defendant-employers never signed the agreement; thus, they

were not bound. *Id.* Likewise, the plaintiffs did not contend on appeal, "nor did they offer to

prove in the district court, that the defendants ratified or assented to [the pension trust agreement,

which was not executed or signed by the defendants,] by making any payments that were

consistent with its terms after the apparent date on its face." *Id.* Ultimately, the Fifth Circuit

rejected the assertion that, absent a written agreement, "the mere fact that some payments were

made can supply the element of definiteness that Congress prescribed" in § 186. *Id.*

Although it did note that "[s]trict compliance with the terms of Section 186(c) is

required to settle a qualifying Taft-Hartley trust," the Fifth Circuit in *Bricklayers* did not impose

a statutory signature requirement, contrary to Insulators' assertion. The central tenet of the

Court's ruling was that a duty to make payments, as specified in a collective bargaining

agreement, cannot lawfully exist in the absence of a trust agreement. The court did not consider whether a course of conduct was sufficient to bind an employer to a valid written agreement under § 186.

More relevant, though less binding, is the second case that Insulators relies upon, *Moglia*. There, the Second Circuit denied the pension benefits to the widow of a deceased employee on the basis that his employer was not a party to the collective bargaining agreement with the union. 403 F.2d at 112, 120. The widow argued that she was entitled to receive her husband's pension payment because the employer manifested assent to the unsigned agreement by making regular contributions to the pension fund on his employee's behalf, and the employee satisfied all of the eligibility requirements for the pension. *Id.* at 118-19.

The court reasoned that the employer did not adopt the unsigned agreement because its conduct did not exhibit a willingness "to accept [the] terms [of the agreement] at any time." *Id.* at 118. The non-union employer, for instance, had refused to enter into any collective bargaining agreement with the union, and refused the union's repeated requests to sign the collective bargaining agreement. *Id.*

In addition, the pension trust agreement specified that contributions would only be received "from employers who signed collective bargaining agreements with the Local requiring such payments." *Id.* at 113. Thus, the court relied on the absence of conduct manifesting assent as well as the explicit language of the collective bargaining agreement in ruling for the union. And, roughly thirty years after its *Moglia* decision, the Second Circuit clarified its holding in that case, explaining that it "did not . . . graft a signature requirement onto Section 302(c)(5)(B)." *Brown v. C. Volante Corp.*, 194 F.3d 351, 355 n. 1 (2d Cir. 1999).

Of note, the Fifth Circuit has held that "adoption of a labor contract is not dependent on the reduction to writing of their intention to be bound. Instead what is required is conduct manifesting an intention to abide by the terms of the agreement." *NLRB v. Haberman Constr. Co.*, 641 F.2d 351, 355-56, n. 1 (5th Cir. 1981) (using the term "labor contract" to refer to a collective bargaining agreement, although the court did not consider §186(c)) (citations omitted). But, whether a party may express consent to a collective bargaining agreement through a course of conduct (i.e., whether a signature is required) and whether a course of conduct is sufficient to satisfy § 186(c)(2)(B)'s "written agreement" requirement are two distinct issues. At this point of the analysis, only the latter issue is relevant.

The Fifth Circuit has never directly held,[26] as far as this Court has found, that conduct manifesting assent to a collective bargaining agreement is sufficient to satisfy § 186(c)(5)(B).

---

[26] The closest the Fifth Circuit has come to examining the issue of whether a signature is required to satisfy § 186(c)'s "written agreement" requirement was in *Firesheets v. A.G. Building Specialists, Inc.*, 134 F.3d 729 (5th Cir. 1998). There, the Fifth Circuit described the holdings of the *Moglia* and *Bricklayers*:

> In Moglia, the Second Circuit held that without signatures on the collective bargaining agreement and the trust agreement attached to it, a written agreement under § 186(c) did not exist. Moglia, 403 F.2d at 118. In Bricklayers, this circuit found that a written agreement under § 186(c) did not exist because: (1) the employer did not sign the trust agreements, (2) the collective bargaining agreement anticipated the creation of only one of the two trusts in question, and (3) the trusts were created after the collective bargaining agreement, and therefore could not have been incorporated by reference into the original agreement.

*Id.*

The *Firesheets* court, however, implicitly endorsed the position that a written but unsigned collective bargaining agreement could satisfy § 186(c). The court noted that the plaintiff's course of conduct argument failed, not because a signature was required, but because the defendant-employer's "actions were not consistent with the existence of a collective bargaining agreement, and that the contribution payments [did] not evidence an intent to be bound." Ultimately, the Fifth Circuit questioned whether a series of notes and records could suffice as a "written agreement" under § 186(c); it did not hold that an employer signature, as opposed to a course of conduct manifesting consent, is required to satisfy § 186(c). *Id.* ("To

17

However, the Seventh Circuit held in *Bricklayer's Local 21 v. Banner Restoration, Inc.*, 385 F.3d 761 (7th Cir. 2004), that § 186 imposes no statutory signature requirement. Instead, an employer's course of conduct that manifests consent to a written collective bargaining agreement is sufficient. Other Circuits are in accord. *See, e.g., Brown*, 194 F.3d at 355, n. 1 (2d Cir. 1999) (holding that § 186(c)(5)(B) "does not require that an agreement be signed, only that it be 'written' and set forth 'a detailed basis on which . . . payments are to be made'" to a trust fund); *Nat'l Leadburners Health & Welfare Fund v. O.G. Kelley & Co.*, 129 F.3d 372, 375, 376 (6th Cir. 1997) ("The statute does not specify any signature requirement and the term 'written agreement' is unambiguous in relation to such"); *Trs. of Atlanta Iron Workers, Local 387 Pension Fund v. S. Stress Wire Corp.*, 724 F.2d 1458, 1459-60 (11th Cir. 1983).

Significantly, this Court is not aware of any circuit that has imposed a statutory signature requirement under § 186(c).[27] Indeed, the plain language of §186(c)(5)(B) requires only a "written agreement" that sets forth "a detailed basis on which . . . payments are to be made" to a trust fund. By its literal language, no signature is required. *See Nat'l Leadburners Health & Welfare Fund*, 129 F.3d at 376 ("[T]he statue is satisfied by a written agreement to which an employer is bound, not a written agreement to which an employer is bound which also carries that employer's signature"). Absent precedent that dictates otherwise or an explicit statutory mandate, this Court will not read a signature requirement into the statute. Accordingly, §186(c)(5)(B) does not impose a signature requirement; instead, "conduct manifesting an

---

allow such documentation to suffice for a written agreement. . . would undermine the congressional intent of § 186(c), which is to create a 'perfectly definite fund,' in which the parties all know what their rights are.")

[27] Although Trustees cited to the Sixth Circuit case *Merriman v. Paul F. Rost Elec. Inc.*, 861 F.2d 135, 137 (6th Cir. 1988), for the proposition that a signature is required to satisfy § 186's "written agreement" requirement, the Sixth Circuit later clarified that decision, holding that "the statute does not specify any signature requirement." *See O.G. Kelley & Co.*, 129 F.3d at 375-76.

intention to abide by the terms of the agreement" is sufficient to bind an employer to a written agreement. *Haberman*, 641 F.2d at 355-56.

Nevertheless, if either the collective bargaining agreement or the trust agreements require a signature, then the Insulator's actions were proper in this case. Here, neither the collective bargaining agreement nor the trust agreements require an employer to sign the respective agreements to be bound.[28] Accordingly, the lack of a signature on part of MSI is not determinative of whether § 186(c)'s written agreement requirement has been satisfied; instead a course of conduct is sufficient to manifest assent to a collective bargaining agreement.

### b. *Conduct Manifesting Intent to Be Bound*

Having determined that a course of conduct is sufficient to bind an employer to a written collective bargaining agreement under § 186(c)(5)(B), this Court must next determine whether there is a genuine issue of material fact concerning whether MSI's conduct manifested consent to the collective bargaining agreement. *Walsh v. E.A. Schlect*, 429 U.S. 401, 407 (1977) (holding that federal law principles of contract apply to labor contracts under federal labor law).

While adoption by conduct describes acceptance of a contract, mutual assent (i.e., mutuality of agreement and mutuality of obligation) is the first requisite to formation of a contract. *See, e.g., Local 107 Office & Prof'l Employees Int'l Union v .Offshore Logistics, Inc.*, 380 F.3d 832, 834 (5th Cir. 2004); *Moglia*, 403 F.3d at 118; 1 Williston on Contracts § 3:4 (4th Ed.). Generally, assent is determined through objective evidence manifesting intent to be bound by the contract. The subjective intent of the parties is relevant only when there are no objective indicia of intent, or the subject matter of the bargain is described in ambiguous terms. *See Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Intern.*, 861 F.2d 1546, 1551-52 (11th Cir. 1988).

---

[28] Defs.' Mot. for Summ. J. Ex. 12, Pension Agreement, Ex. 13, Health & Welfare Trust Agreement [Docs. 32-13 & 32-14]; Defs.' Reply, Ex. 1, Master Agreement [Doc. 45-3].

Overall, the evidence must establish that the parties both enjoyed the benefits of the contract and abided by its provisions. *See* Williston on Contracts § 3:4.

While the ultimate inquiry is whether the employer's objective conduct manifests assent to the agreement in light of the provisions of that agreement, specific factors of emphasis in collective bargaining agreement cases include: (1) the payment of fringe benefit contributions, (2) the exclusive employment of union members, (3) the payment of union wages, (4) the observation of holidays, (5) use of the Union hiring hall, and (6) the existence of other agreements evidencing assent and the submission of the employer to union jurisdiction, such as those created by allowance or grievance procedures. *See Holleman*, 751 F.2d at 771; *Haberman*, 641 F.2d at 356; *see also Line Constr. Benefit Fund v. Allied Electrical Contractors, Inc.*, 591 F.3d 576 (7th Cir. 2010). The extent of these activities is important to the determination of whether the employer is bound by the collective bargaining agreement.[29] In addition, the most important factor is the payment of fringe benefit contributions. After all, if an employer is not bound by a written agreement (i.e., a collective bargaining agreement), those contributions are

---

[29] For example, in *Millwright & Machinery Erectors Local Union 729 v. Gulf Engineering Co.*, Civ. Ac. No. 10-989, 2011 WL 162071, at *2 (E.D.La. Jan. 18, 2011), the court found the defendant-employer did not manifest assent to an expired collective bargaining agreement through its conduct, finding that the activities consistent with an agreement were insufficient to bind the employer to that agreement. There, the defendant hired millwrights through the union, paid the union mandated wage rates, made pension fund contributions on behalf of all union workers, and signed fringe benefit fund remittance reports that also included language acknowledging that it was bound by provision of a collective bargaining agreement, it nevertheless held that the defendant did not manifest an intent to be bound by the expired collective bargaining agreement. *Id.* at *5. The court found that the defendant refused to recognize the Local as the exclusive bargaining agent after the CBA had expired and did not contact the Local for work performed in the Local's jurisdiction. *Id.* The court further explained that the defendant only used the Local's members sparingly, and that the defendant affirmatively rejected and refused to sign the Local's proposed agreements. *Id.* Citing to Fifth Circuit precedent, the court explained that fund contributions and language in work referral forms that reference a collective bargaining agreement did not provide evidence of an intent to be bound. *Id.* (citing *Firesheets*, 134 F.3d at 731-32).

illegal. *See* 29 U.S.C. §186(c)(4); *U.S. Can Co. v. NLRB*, 984 F.2d 864, 869 (7th Cir. 1993). At the same time, contributions alone are insufficient to establish assent to an agreement. *Holleman*, 751 F.2d at 771.

In *Haberman*, for example, the court concluded that the employer manifested an intent to abide by the labor contract by enjoying the benefits of the contract and abiding by its provisions when the employer had contributed to the union's trust fund for four years, exclusively used union members for its work, observed union holidays, used the union for referrals, paid the union wage scale, and permitted the union to appoint a union job steward. 641 F.2d at 356.

By contrast, in *Firesheets*, the court found an employer's actions, viewed collectively, were inconsistent with the existence of a collective bargaining agreement. 134 F.3d at 731 (dicta). There, the employer continued to make contributions to the union's trust fund after the expiration date of the collective bargaining agreement. *Id.* The employer also continued to remit monthly contributions reports, which included language stating that it was bound by provisions of the agreement with the local. *Id.* However, the employer also engaged in activity that was inconsistent with the original, expired agreement: it hired nonunion workers, set wages, and made trust fund contributions only for those employees who asked for contributions. In addition, the employer did not adjust wage rates, and did not give holiday pay to its employees. *Id.* In finding that these actions were insufficient to manifest assent to the collective bargaining agreement, the court reiterated that contribution payments did not evidence an intent to be bound, and found the language on the remittance reports insufficient to bind the employer. *Id.*

Likewise, in *Panek v. Climato Bros. Const., Inc.*, 2007 WL 3033948 (W.D.N.Y. 2007), the court found that an employer's conduct did not manifest assent to a collective bargaining agreement. *Id.* at *2. There, the court reasoned that the employer's contribution payments and

remittance reports were not alone sufficient to bind the employer to the collective bargaining agreement because the remainder of the employer's actions was inconsistent with that agreement. For example, the employer never held a pre-job conference with the union; never allowed the union or funds to conduct and audit; never appointed or had a union shop steward on any job; paid different wages to non-union laborers, who were performing the same work as union laborers; paid contributions on behalf of some, but not all, of its employees; and never requested any laborers from the union. *Id.*

Here, Insulators raises two arguments to support its contention that MSI did not assent to collective bargaining agreement: (1) Farris's conduct (i.e., that he did not sign the agreement) is inconsistent with the formation of that agreement, and (2) Farris's actions are inconsistent with the actual agreement. Insulators provides examples to support the latter argument, which include: (1) MSI's failure to conform to the agreement by employing his own "banking" system when reporting hours contributions; (2) MSI's failure to pay his employees at the wage rates prescribed by the Union; (3) MSI's failure to contribute to the funds on behalf of non-Union employees; and (4) MSI's refusal to submit to an audit.[30]

This Court finds that Insulators has failed to carry its initial summary judgment burden; it has failed to identify portions of pleadings and discovery that show a lack of a genuine issue of material fact for trial. First, relying on Farris' deposition, Insulators asserts that, like the employer in *Firesheets*, who set its own wage rates and did not adjust wage rates as required by the union, Farris did not pay Union wages because it did not reduce MSI's wage rates by one dollar upon notice from the Union that the Fund needed additional contributions.[31]

---

[30]

[31] Defs.' Mot. for Summ. J. 14-17 [Doc. 32]; Defs.' Reply 4-6 [Doc. 45-2].

Viewing the facts in a light most favorable to the plaintiffs, Farris' statements do not rise to level of non-compliance that would vitiate assent. Farris testified that he made a decision to give the employees back the dollar the Union voted to deduct from the employees' salaries and contribute to the fund. But, when asked how long that discrepancy occurred, he responded that he "didn't think that it was any time, . . . maybe a week."[32] Unlike the employers' conduct in *Panek* and *Firesheets*, this evidence merely indicates one week of non-compliance over a period of over ten years. *Firesheets*, 134 F.3d at 731; *Panek*, 2007 WL 3033948, at * 2; *see Millwright*, 2011 WL 162071, at *2.

Second, Insulators complains that MSI violated the terms of the collective bargaining agreement by employing its own "banking" system of employee work hours, just as the employers in *Firesheets* and *Panek* did not subscribe to the provisions of the collective bargaining agreement. *Firesheets*, 134 F.3d at 731; *Panek*, 2007 WL 3033948, at * 2. However, this evidence is insufficient for the same reasons as the prior argument. The evidence does not indicate how often this conduct occurred. Indeed, Insulators cites Mr. Mims deposition testimony describing a conversation he had with Mr. Farris, during which Mr. Farris indicated that he "sometimes" banked his employees hours when work was slow. No evidence indicates how often MSI banked its hours.[33]

Third, because MSI employed nonunion employees and failed to pay contributions on their behalf, like the employers in *Firesheets* and *Panek*, Insulators argues that MSI's conduct is inconsistent with assent to the collective bargaining agreement. *Firesheets*, 134 F.3d at 731; *Panek*, 2007 WL 3033948, at * 2. Just as the employer in *Panek* paid different wages to

---

[32] Pls.' Opp'n, Ex. 1, Dep. of Richard Farris, 77 [Docs. 41-2].

[33] Defs.' Mot. for Summ. J., Ex. 3, Dep. of James Edgar Mims, 49 [Doc. 32-5].

nonunion laborers that performed bargaining unit work, MSI also paid its nonunion laborers a different rate than union laborers. 2007 WL 3033948, at * 2. But, the difference is of little consequence: MSI paid the prevailing union hourly wage scale with the only variation based on MSI including the fund credits in the nonunion laborers paychecks. Nevertheless, as stated above, the prevalence and extent of this practice is unclear from the summary judgment evidence. Thus, a material issue of fact exists as to the extent MSI breached the collective bargaining agreement by hiring nonunion employees and failing to pay contributions on behalf of nonunion employees.

Fourth, unlike the employer in *Millwright*, who affirmatively rejected and refused to sign the Local's proposed agreements, it is unclear whether Mr. Farris at all times refused to sign the collective bargaining agreement. 2011 WL 162071, at *5. While it is clear that Mr. Farris objected to signing the collective bargaining agreement out of fear that he would be tied to the agreements unfunded liability, it is unclear whether this action is sufficient to prove MSI did not intend to abide by the agreement. And, unlike the timeline in *Millwright* and *Firesheets*, where the employers refused to enter into a new collective bargaining agreement with the union after the original agreement expired, there is no bright-line to draw in this case. *Firesheets*, 134 F.3d at 731; *Millwright* 2011 WL 162071, at *5. The collective bargaining agreement remained in force from the time MSI began remitting contributions to the time the trustees denied the plaintiffs' benefits. Viewing the facts in a light most favorable to the plaintiffs, Mr. Farris' conduct prior to 2006, before he refused to sign the proposed agreement, does not support the contention that MSI unequivocally did not assent to the collective bargaining agreement. In other words, a material issue of fact remains over whether Mr. Farris's conduct before and after 2006 was sufficient to find that he did not manifest assent to the collective bargaining agreement.

Finally, there is a material issue of fact over whether MSI, in fact, refused to submit to an audit. Subjective evidence, such as Mr. Farris' belief that Insulators lacked the authority to conduct an audit, is not relevant. In addition, unlike the employer in *Panek*, who never allowed the union or funds to conduct an audit, evidence here indicates that the failure to conduct an audit could be attributed to either party.[34] 2007 WL 3033948, at * 2.

In sum, the evidence submitted by Insulators, at best, demonstrates isolated acts of noncompliance that, even when viewed collectively, do not rise to level of conduct inconsistent with assent to a contract. Just as the employer in *Haberman* consistently contributed to the union's trust funds, observed union holidays, paid the union wage scale, and used the union for referrals, MSI always contributed to the union trust fund, observed union holidays, generally paid the union wage scale, and used the union for at least one referral. 641 F.2d at 356. Mindful that Insulators bears the ultimate burden of persuasion on its summary judgment motion, the evidence is insufficient to establish that MSI's contributions were unlawful under § 186 because it was not a party to the collective bargaining agreement.

On the other hand, the plaintiffs contend in their motion for summary judgment that MSI's course of conduct proves that MSI adopted the collective bargaining agreement. For instance, they note that MSI consistently paid contributions to the union trust funds and contributed to the Industrial Assessment fund and a Building Fund, as required under the collective bargaining agreement. In addition, MSI hired insulators who were members of the local, with few exceptions. Likewise, one of the plaintiffs, Michael Bourgeois, testified that MSI complied with the union conditions during his approximately six-month period of employment with MSI.

---

[34] *See* Pls.' Opp'n, Ex. 1, Dep. of Richard Farris, 97-99 [Doc. 41-2].

While the plaintiffs admit that MSI did not contribute on behalf of non-union employees, they assert that Insulators has not identified a provision of the master agreement that prohibits the hiring of nonunion employees. Finally, they note that the other evidence Insulators cites to, such as MSI paying one dollar above the union mandated pay scale and banking credits on behalf of employees, is insufficient to establish that, as a matter of law, MSI did not assent to the collective bargaining agreement.

However, the plaintiffs' cross-motion for summary judgment fails for many of the same reasons that Insulators' motion for summary judgment failed. Most of the plaintiffs' evidence is based on MSI's consistent contributions in accordance with the collective bargaining agreement.[35] While this is some of the best evidence to indicate MSI's intent to be bound, contributions alone are insufficient. *See Holleman*, 751 F.2d at 771. When viewing the evidence in a light most favorable to the non-moving party, other relevant and material issues of fact remain.

For instance, there is an issue of material fact over whether MSI's acts of non-compliance with the terms of the collective bargaining agreement provides sufficient objective evidence that Mr. Farris did not bind MSI to the agreement. Unlike the employer in *Haberman*, who used the union for referrals, Mr. Farris testified that he only requested union employees once in the over ten year existence of MSI.[36] 641 F.2d at 356. During that time, however, Mr. Farris employed non-union workers, which is a violation of the collective bargaining agreement.[37] And, like the

---

[35] *See* Pls.' Opp'n, Ex. 1, Dep. of Richard Farris, F4-F16 [Doc. 41-2]

[36] *See* Pls.' Opp'n, Ex. 1, Dep. of Richard Farris, 68 [Doc. 41-2]. MSI did not obtain employees through the union hiring hall; instead, he spoke with the Local's business manager, Mr. Mims.

[37] The collective bargaining agreement required employers to hire union employees. The master agreement covers the rate of pay, rules, and working conditions of all "Mechanics, Apprentices, and/or Improvers" engaged in work for an employer subject to the collective bargaining. The

26

employer in *Panek*, he paid nonunion workers a different wage, even when they were performing bargaining unit work. 2007 WL 3033948, at * 2. Accordingly, if he hired nonunion employees instead of union employees over an extended period of time, MSI's actions may evidence extensive acts of non-compliance in light of MSI's limited operations.

Likewise, there is an issue of material fact over the extent MSI violated other terms of the collective bargaining agreement by banking employee hours and refusing to comply with the wage rates prescribed by the Union. It is clear that MSI violated the terms of the agreement when it engaged in this behavior. Nevertheless, the summary judgment evidence does not establish the extent of these acts of noncompliance.

For example, the summary judgment evidence indicates that, unlike the employer in *Haberman*, who exclusively paid the union wage scale, MSI refused to lower its employee wage rates one dollar when directed to do so by the Union; however, it is unclear how often the Union varied its wage rates.[38] 641 F.2d at 356. If this represented one of the few times the Union reduced wages, then MSI's actions may indicate an intention not to be bound by the collective bargaining agreement. However, if wage rates were subject to annual adjustments, this isolated act of non-compliance may be insufficient to establish that MSI did not assent to the collective bargaining agreement. At this point, the plaintiffs have not established that this conduct was merely isolated, when viewing the facts in a light most favorable to Insulators.

---

master agreement recognized the Union as "the *exclusive* collective bargaining agent for Mechanics, Apprentices, and/or Improvers." Only when a local union does not furnish qualified workmen within 48 hours is the contractor free to obtain workmen from other sources. *See* Defs.' Reply, Ex. 1, Master Agreement [Doc. 45-3].

[38] The evidence only establishes a two-week period over a six-month employment relationship with Michael Bourgeois. *See* Pls.' Opp'n, Ex. 2, Dep. of Michael Bourgeois, 63 [Doc. 41-3].

As noted above, like the employers in *Firesheets* and *Millwright*, who refused to sign a collective bargaining agreement, Mr. Farris did at one point object to Insulators' request to sign the collective bargaining agreement, stating that he did not want to be tied to any unfunded liability. *Firesheets*, 134 F.3d at 731; *Millwright* 2011 WL 162071, at *5. Thereafter, he continued to object to signing an agreement. Viewed in a light most favorable to Insulators, this provides evidence that MSI refused to accept the obligations of the collective bargaining agreement.

As the court reasoned in *Firesheets*, *Millwright*, and *Panek*, these actions are significant: viewed collectively, they represent material issues of fact in the determination of whether MSI's conduct manifested assent to the unsigned collective bargaining agreement. *Firesheets*, 134 F.3d at 731; *Millwright* 2011 WL 162071, at *5; *Panek*, 2007 WL 3033948, at * 2. However, unlike the evidence in *Haberman*, *Firesheets*, *Millwright*, and *Panek*, the evidence here is not so overwhelming for or against one particular party that there is no material issue of fact for trial. *Haberman*, 641 F.2d at 356; *Firesheets*, 134 F.3d at 731; *Millwright* 2011 WL 162071, at *5; *Panek*, 2007 WL 3033948, at * 2.

For example, unlike the employer in *Haberman*, who consistently abided by the terms of the collective bargaining agreement (e.g., by paying the union wage scale) while incurring some of its burdens (e.g., permitting the union to appoint a job steward), the evidence does not demonstrate that MSI complied with the terms of the collective bargaining such that, as a matter of law, this Court can find that its course of conduct manifested assent to that agreement. 641 F.2d at 356. Likewise, unlike the employers' conduct in *Firesheets*, *Millwright*, and *Panek*, who consistently defied or did not abide by the terms of the collective bargaining agreement, the evidence is insufficient to find that MSI did not intend, through its conduct, to assent to the

collective bargaining agreement. *Firesheets*, 134 F.3d at 731; *Millwright* 2011 WL 162071, at

*5; *Panek*, 2007 WL 3033948, at * 2. In short, the evidence is insufficient to establish that either

party is entitled to summary judgment. Accordingly, it is

ORDERED that (1) Insulators' Motions for Summary Judgment against the plaintiffs

[Doc. 32] is DENIED, (2) the plaintiffs' Cross-Motion for Summary Judgment is DENIED, (3)

Insulators' Motion for Summary Judgment against MSI [Doc. 33] is DENIED, and (4)

Insulators' Motion for Summary Judgment against AGM, et al. [Doc. 34] is DENIED;

Lake Charles, Louisiana, this ⟨ ⟨ day of _____ May _____ 2011.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE